**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | |
| | § | **NO. EP-23-CR-00823-KC** |
| **ANTONIO SING-LEDEZMA,** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO QUASH
COUNTS 1, 3, AND 4 OF INDICTMENT**

Defendant Antonio Sing-Ledezma is charged in a four count indictment with being an Illegal Immigrant in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(5)(A), Count One: Illegal Re-Entry, in violation of 8 U.S.C. §1326(a), Count Two; Possession of Ammunition by an Illegal Immigrant, in violation of 18 U.S.C. § 922(g)(5)(A), Count Three; and Possession of a Firearm with an Obliterated Serial Number, in violation of 18 U.S.C. § 922(k) and 924(a)(1)(B), Count Four, ECF No. 11.

Defendant Antonio Sing-Ledezma (hereinafter either Defendant or Sing-Ledezma) filed a motion to quash counts 1,3, and 4 of the Indictment, ECF No. 23. In his motion, Defendant Sing-Ledezma contends that the principles articulated in *United States v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010) and *New York Rifle and Pistol Assoc. v. Bruen*, 142 S.Ct. 2111 (2022) mean that, under the Second Amendment, the government cannot restrict his right to possess a firearm. *Id.* Defendant's argument is without merit. Nothing in *Heller, McDonald,* or *Bruen* casts

doubt on the ability of the federal government to prohibit undocumented immigrants like Defendant from possessing a firearm.  The Court should deny Defendant's Motion.

## Prologue

The Second Amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to possess arms for self-defense.  *Id.* at 635.  The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and that the right remains subject to "lawful regulatory measures."  *Id.* at 626, 627 n.26.  And 18 U.S.C.  § 922(g)(5)(A) constitutes one such lawful regulatory measure as does 18 U.S.C. § 922(k).

Pursuant to Section 922(g)(5)(A), "[i]t shall be unlawful for any person ...  who, being an alien ...  is illegally or unlawfully in the United States" to ship, transport, possess, or receive any firearm or ammunition in or affecting interstate or foreign commerce. Count Two of the Indictment returned against Defendant Sing-Ledezma charges a violation of Title 8 U.S.C. § 1326(a), Illegal Re-Entry.  Sing-Ledezma is an alien illegally in the United States.

On March 31, 2023, El Paso Police Officers heard numerous gunshots in the area of the 1300 block of George Dieter Drive.  Officers saw a Chevrolet Malibu with a temporary license plate driving erratically.  Officers conducted a traffic stop on the Malibu.

Defendant was the driver and sole occupant of the car.  Defendant identified himself as "Ramiro Sing".  Officers used a digital fingerprint scanner and were able to

determine Defendant's correct name, Antonio Sing-Ledezma.  Defendant told officers he

had been shot in the leg.  Officers saw a bullet hole in the driver's side door.  Video shows

no blood coming from Defendant's leg.

Officers patted-down Defendant for weapons.  When asked, Sing-Ledezma told

officers he had a glass pipe on his person.  Officers found a glass pipe in Defendant's

jacket pocket and one .38 caliber round of ammunition.  When asked again if he had

anything else on him, Sing-Ledezma admitted to having marijuana in his pocket which

officers found.

Officers then searched the Malibu and located approximately 0.72 ounces of

additional marijuana, eleven (11) .38 rounds of ammunition, and a Bersa, model Thunder

380, .380 caliber pistol with an obliterated serial number.  Officers canvased the

immediate area where the traffic stop occurred and found five (5) spent .380 caliber

casings which matched the one found on Defendant's person and the ammunition found

in the car.  Sing-Ledezma was arrested.

Alcohol, Tobacco, Firearms, and Explosives (ATF) joined the investigation and

conducted a criminal history check on Defendant.  They were able to determine Sing-

Ledezma, on December 28, 2016 pleaded guilty to a violation of 8 U.S.C. § 1325(a)(1),

Improper Entry by an Alien.  A Homeland Security Investigations agent performed an

immigration records check on Defendant and was able to determine Sing-Ledezma was a

citizen and national of Mexico.  The records check also showed that Defendant was

ordered removed from the United States on December 19, 2016, and subsequently was

removed from the United States on December 31, 2016, at the Paso Del Norte Port of Entry.

In his Motion, Sing-Ledezma cites to *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. 742 (2020), for his belief that non-citizens have a right to carry firearms in public or at home for self-defense.  Defendant goes on to cite *New York Rifle and Pistol Assoc. v. Bruen*, 142 S.Ct. 2111 (2022) as invalidating any intrusion on the right to carry in public for self-defense unless such intrusion is firmly rooted in United States history.

Defendant's premise is that under *Bruen* the statutes under which Defendant is charged are facially unconstitutional as prohibiting the lawful act of carrying a firearm in self-defense and does not permit the regulation of an act wholly authorized by the United States Constitution.   Defendant further believes his prosecution under the statutes is unconstitutional and there is no balancing act or step-by-step analysis which can save the prosecution.  Sing-Ledezma's argument fails for two reasons.

First, S i n g - L e d e z m a ,  as an undocumented immigrant, is not part of "the people" to whom the Second Amendment applies.  The Second Amendment provides only for "the right of *the people* to keep and bear Arms."  U.S. Const. amend. II (emphasis added).  The Supreme Court, including in *Bruen,* has repeatedly framed the scope of this right as protecting the rights of "citizens" who are "law-abiding"; Sing-Ledezma is neither. *See, e.g., Heller,* 554 U.S. at 635 (holding that the Second Amendment  protects "the right of law-abiding, responsible citizens to use arms in defense of hearth *and home");McDonald v. City of Chicago,* 561 U.S. 742, 768 (2010) (describing *Heller* as  holding that "citizens must be

permitted 'to use [handguns] for the core lawful purpose of self-defense'" (quoting *Heller,* 554 U.S. at 630) (alteration in *McDonald)); Bruen,* 142 S.Ct. at 2131, (characterizing the right as belonging to "law-abiding citizens"). The historical understanding of the Second Amendment, which did not extend the right to bear arms to those outside of the political community, is consistent with this understanding of "the people" as limited to citizens. The scope of the Second Amendment's text is thus itself sufficient to deny Sing-Ledezma's motion to quash.

Second, to the extent the Court goes on to analyze whether the Second Amendment permits the restriction in Section 922(g)(5)(A), that restriction is consistent with and similar to relevant historical practice around firearms regulation. Nonmembers of the political community have historically been denied the right to firearms possession by colonial and Founding-era legislatures, making Section 922(g)(5)(A)'s restriction consistent with historical firearms restrictions. And while laws explicitly barring undocumented immigrants from firearm possession are of more recent vintage, that is because illegal immigration is itself a new problem. The Court should therefore follow *Bruen's* instruction by looking to analogous-and not strictly identical-historical restrictions upon those deemed nonmembers of the political community and conclude that Section 922(g)(5)(A) is consistent with such restrictions.

In short, nothing in the Supreme Court's recent Second Amendment cases, all of which concerned restrictions on the ability of law-abiding citizens to keep and bear arms, should cause this Court to reconsider the unanimous consensus of appellate courts.

## **Legal Argument**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the  people to keep and bear Arms, shall not

be infringed." U.S. Const. amend. II.  In *Heller,* the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense. 554 U.S. at 635. The Court cautioned, however, that the right to keep and bear arms "is not unlimited" and the right remains subject to "presumptively lawful regulatory measures." *Id.* at 626, 627 n.26.

In *Bruen,* the Court again considered the meaning of the Second Amendment, in connection with a New York licensing scheme which allowed authorities to deny concealed carry permits even to those who met threshold criteria. In so doing, the Court directed lower courts to ask two questions when evaluating what limitations Congress can impose on citizens' Second Amendment rights. First, a court must consider whether "the Second Amendment's plain text covers an individual's conduct," and if it does, then "the Constitution presumptively protects that conduct." *Bruen,* 142 S. Ct. at 2129-30. In that scenario, "the government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (internal quotation marks omitted).

Here, under the avenues of inquiry outlined in *Bruen,* Section 922(g)(5)(A) remains a permissible restriction on firearms possession unencumbered by the Second Amendment, as the Fifth Circuit (the first circuit court to rule on the issue) found in its *pre-Bruen* decision: *United States v. Portillo-Munoz*, 643 F.3d 437 at 442 (2011) that certain restrictions on the Second Amendment are permissible, including

Section 922(g)(5)'s prohibition on an "alien" "who is unlawfully or illegally within the United States" possessing a firearm.  As discussed below, under *Bruen's* first line of inquiry, unlawful noncitizens do not fall within the textual purview of the Second amendment.  The Seventh Circuit ruling in its *pre-Bruen* decision: *United States v. Meza-Rodriguez,* 798 F.3d 664, 669-72 (7th Cir. 2015) (recognizing that certain restrictions on the Second Amendment are permissible, including Section § 922(g)(5)'s prohibition on an "alien" "who is unlawfully or illegally within the United States" possessing a firearm) is in accord.  As discussed herein, under *Bruen's* first line of inquiry, unlawful noncitizens do not fall within the textual purview of the Second Amendment, and even if they did, Section 922(g)(5) would still be constitutionally permissible because, under *Bruen's* second line of inquiry, the statute is consistent with historical regulation of firearms.

Every other court of appeals to date that considered Section 922(g)(5)'s constitutionality has agreed with the Fifth and Seventh Circuits that the statute is constitutional. *See, e.g., United States v. Flores* 663 F.3d 1022 (8th Cir. 2011); *United States v. Perez,* 6 F.4th 448 (2d Cir. 2021); *United States v. Carpio-Leon,* 701 F.3d 974 (4th Cir. 2012); *United States v. Huitron-Guizar,* 678 F.3d 1164 (10th Cir. 2012).

Precedent demonstrates that the Second Amendment belongs to citizens.  In *Heller,* the Supreme Court determined that "the Second Amendment right is exercised individually and belongs to all *Americans."* 554 U.S. at 581 (emphasis added).  The rest of the Court's opinion likewise reflects the understanding that the right to keep and bear arms belongs to "citizens" who are "law-abiding." *See id.* at 595 ("right of citizens"); *id.* at 603 ("an individual citizen's right");

*id.* at 608 (right "enjoyed by the citizen" (citation omitted)); *id.* at 613 ("citizens ha[ve] a right to carry arms"), *id.* at 625 ("weapons not typically possessed by law-abiding citizens"); *ibid.* ("possession of firearms by law-abiding citizens"); *id.* at 635 ("law-abiding, responsible citizens").

Subsequent Supreme Court cases have similarly identified the right as belonging to law-abiding citizens. *See, e.g., McDonald,* 561 U.S. at 767-68 ("Thus, we concluded, citizens must be permitted 'to use [handguns] for the core purpose of lawful self-defense.'" (quoting *Heller,* 554 U.S. at 630) (alteration in *McDonald)); id.* at 775 ("one of the 'core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances' of freedmen who had been stripped of their arms and to 'affirm the full and equal right of every citizen to self-defense'" (quoting A. Amar, The Bill of Rights: Creation and Reconstruction 187, 264-65 (1998))); *Bruen,* 142 S. Ct. at 2122 ("In *[Heller]* and *[McDonald]* we recognized that the Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense."); *id.* ("ordinary, law-abiding citizens"); *id.* at 2133 (framing appropriate historical analogies as comparing "how and why the regulations burden a law-abiding citizen's right to armed self-defense"); *id.* at 2134 ("It is undisputed that petitioners Koch and Nash-two ordinary, law-abiding, adult citizens-are part of 'the people' whom the Second Amendment protects."); *id.* at 2150 ("law-abiding citizens"); *id.* at 2156 ("law-abiding citizens").

Sing-Ledezma cannot avoid the Supreme Court's repeated emphasis that the Second Amendment right belongs to law-abiding citizens, a category from which he is doubly excluded, being neither a citizen nor being "law-abiding".

In *Heller*, 554 U.S. at 580, the Court, explaining the meaning of "the people" quotes itself from its opinion in *United States v. Verdugo-Urquidez,* 494 U.S. 259, 265 (1990),

> "The people" seems to have been a term of art employed in select parts of the Constitution . . . . Its uses suggest that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.

but this passage does not support Sing-Ledezma being a part of the community.    In the sentence immediately preceding the quoted language, the Supreme Court explained that "the term ['the people'] unambiguously refers to all members of the *political community." Heller,* 554 U.S. at 580 (emphasis added).  The difficulty this poses for any argument Sing-Ledezma may make for being a part of the community merely by being present in the United States is that the "political community," through its elected representatives, has excluded undocumented immigrants like Defendant from its membership:

> That illegal aliens remain outside the political community is reflected throughout the Constitution and federal law.  Illegal aliens may not hold federal elective office, U.S. Const. art. I, § 2, cl. 2; *id.* art. I § 3, cl. 3; *id.* art. II, § 1, cl. 5, are barred from voting in federal elections, 18 U.S.C. § 611(a), may not serve on federal juries, 28 U.S.C. § 1865(b)(l), and are subject to removal from the United States at any time, 8 U.S.C. § 1227(a).

*Perez,* 6 F.4th at 463 (Menashi, J., concurring in the judgment); *see also Cabell v. Chavez-Salido,* 454 U.S. 432, 438-40 (1982) (observing that "citizenship ... determin[es] membership in the political community" and that "[a]liens are by definition ... outside of this community").  Thus, "[i]llegal aliens are not 'law-abiding, responsible citizens' or ... 'members of the political community'-that is, 'the people'-who may invoke the Second Amendment." *Perez,*

6 F.4th at 463 (Menashi, J., concurring in the judgment) (quoting *United States v. Portillo-Munoz,* 643 F.3d 437,440 (5th Cir. 2011), *and Heller,* 554 U.S. at 580).

The Second Circuit has not yet definitively resolved this question. *See Perez,* 6 F.4th at 453 (declining to decide whether undocumented immigrants have a constitutional right to bear arms, and upholding Section 922(g)(5)(A) on other grounds);2 *see also United States v. Torres,* 911 F.3d 1253, 1258-61 (9th Cir. 2019) (similar); *United States v. Huitron-Guizar,* 678 F.3d 1164, 1167-70 (10th Cir. 2012) (similar). But a clear majority of Courts of Appeals to answer the question have determined that undocumented immigrants are not among "the people" or "political community" to whom the Second Amendment applies, or otherwise are not protected by the Second Amendment. *See United States v. Jimenez-Shi/on,* 34 F.4th 1042, 1043-47 (11th Cir. 2022) (concluding, based on Second Amendment's "text and history," that illegal aliens "do not enjoy the right to keep and bear arms"); *United States v. Carpio-Leon,* 701 F.3d 974,979 (4th Cir. 2012) (discussing *Heller, Verdugo-Urquidez,* and the historical record at length and concluding "that illegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection"); *United States v. Flores,* 663 F.3d 1022, 1023 (8th Cir. 2011) (holding that "the protections of the Second Amendment do not extend to aliens illegally present in this country"); *Portillo-Munoz,* 643 F.3d at 442 ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *see also United States v. Singh,* 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to Section 922(g)(5)(B) and noting that "those unlawfully present ... are neither citizens nor members of the political community"), *cert. denied,* 141 S. Ct. 2671 (2021); *but see United States v. Meza-Rodriguez,* 798 F.3d 664, 669-72 (7th Cir. 2015) (concluding that the defendant was among "the people" but upholding§

922(g)(5)(A) other grounds).    And Judge Menashi, concurring in *Perez,* "would join those circuits that have held that illegal aliens are not among 'the people' to whom the right to keep and bear arms under the Second Amendment belongs." 6 F.4th at 461 (Menashi, J., concurring in the judgment).

Bruen did nothing to cast doubt upon the decisions that have held that the Second Amendment does not extend to undocumented immigrants. *Bruen* noted that the Courts of Appeals had, since *Heller,* coalesced around a two-step framework for evaluating Second Amendment claims:

> At the first step, the government may justify its regulation by establishing that the challenged law regulates activity falling outside the scope of the right as originally understood.  The Courts of Appeals then ascertain the original scope of the right based on its historical meaning.  If the government can prove that the regulated conduct falls beyond the Amendment's original scope, then the analysis can stop there; the regulated activity is categorically unprotected.   But if the historical evidence at this step is inconclusive or suggests that the regulated activity is not categorically unprotected, the courts generally proceed to step two [the application of means-end scrutiny].

*Id.* at 2126 (cleaned up).

Although the Supreme Court struck down the application of means-end scrutiny, it blessed the first step in this inquiry as "broadly consistent with *Heller." Id.* at 2127. Accordingly, the Court can look to the holdings of the Fourth, Fifth, Eighth, and Eleventh Circuits, as well as Judge Menashi's *Perez* concurrence, to conclude that Sing-Ledezma's challenge necessarily fails because undocumented immigrants are not among "the people" protected by the Second Amendment.

### Section 922(g)(5)(A) Is Consistent with Historical Precedent.

Even if this Court were to conclude that the Second Amendment covers defendant's conduct, defendant still cannot prevail on his *Bruen-based* argument. Under *Bruen,* even where the plain text of the Second Amendment applies, the government may justify a challenged restriction by showing "that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Where Section 922(g)(5) is in keeping with this nation's historical traditions, this Court should not declare it unconstitutional.

*Bruen* contemplated two avenues of historical inquiry. The first, applied in *Bruen* itself, is what the Supreme Court described as a "straightforward historical inquiry" which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." 142 S. Ct. at 2131. The second avenue of inquiry *Bruen* directed, is by "historical analogy." *Id.* at 2132. *Bruen* recognized that "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* Where there is no such straightforward correspondence (as was the case with the blanket restrictions on gun possession by law-abiding citizens at issue in *Heller* and *Bruen), Bruen* directed courts to consider "historical analogies" to the challenged law to determine whether it resembles constitutionally accepted restrictions. *Id.* Under either avenue of inquiry, Sing-Ledezma's challenge to Section 922(g)(5) fails.

**Section 922(g)(5)(A) is consistent with the relevant historical practice
around firearms regulation.**

Section 922(g)(5)(A) is consistent with and similar to relevant historical practice around firearms regulation. The historical record supports the conclusion that the Second Amendment was understood to extend the right to bear arms only to citizens-and, indeed, only to specific categories of citizens-at the time of its ratification.

Under the English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," the right to keep and bear arms was expressly limited to "Subjects." *Heller,* 554 U.S. at 593 (quoting Bill of Rights 1689, 1 W. & M., ch. 2, § 7, Eng. Stat. at Large 441); *see id.* ("By the time of the founding, the right to keep and bear arms had become fundamental for English *subjects."* (emphasis added)). And in colonial America,

> [T]he right to keep and bear arms "did not extend to all New World residents." Joyce Lee Malcolm, To Keep and Bear Arms: The origins of an Anglo-American Right 140 (1996). While "[a]lien men ... could speak, print, worship, enter into contracts, hold personal property in their own name, sue and be sued, and exercise sundry other civil rights," they "typically could not vote, hold public office, or serve on juries" and did not have "the right to bear arms" because these "were rights of members of the polity." Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 48 (1998).

*Perez,* 6 F.4th at 462 (Menashi, J., concurring in the judgment) (footnotes omitted).

*See also Jimenez-Shilon,* 34 F.4th at 1047-48:

> The individual right to bear arms enshrined in the English Declaration of Rights-which "has long been understood to be the predecessor to our Second Amendment"-was not made "available to the whole population." *Heller,* 554 U.S. at 593, 128 S.Ct. 2783. Instead, it was limited to the "Subjects which are Protestants, ... suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). We have found no historical evidence indicating

that aliens shared this fundamental right with either natural-born Brits or denizens (who might be thought of as naturalized British subjects), both of whose relationships to the sovereign mirrored that of American "citizens." Indeed, the right to own guns in eighteenth-century England was statutorily restricted to the landed gentry. *See, e.g.,* Patrick J. Charles, *Armed in America* 51, 58 (2018); Giles Jacob, *A New Law-Dictionary* (1750) (unpaginated), *reprinted in The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 300 (Neil H. Cogan ed., 2d ed. 2015). And the English common law simultaneously made it such that "aliens [were] incapacitated to hold lands." *Bayard v. Singleton,* 1 N.C. 5, 9 (1787) *1047 (emphasis omitted); *see Dawson's Lessee v. Godfrey,* 8 U.S. (4 Cranch) 321, 323-24, 2 L.Ed. 634 (1808); Blackstone, *supra,* at *372.

*See also Carpio-Leon,* 701 F.3d at 980 ("In England, the right to bear arms allowed the government to disarm those it considered disloyal or dangerous.").

Accordingly, colonial-era statutes did not extend the right to bear arms to those who were, at the time, not considered part of the citizenry who swore allegiance to the United States. For instance, Massachusetts and Virginia forbade the arming of Native Americans, *see* Malcolm, *supra,* at 140, and Virginia also prohibited Catholics from owning arms unless they swore "allegiance to the Hanoverian dynasty and to the Protestant succession," *see* Robert H. Churchill, Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment, 25 L. & Hist. Rev. 139, 157 (2007).

Similarly, during the American Revolution, colonial governments disarmed persons who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 506 (2004); *see id.* at 506 nn.128-129 (collecting statutes); *see generally* Churchill, *supra* at 159 ("[T]he new state governments ... framed their police power to disarm around a test of allegiance."). And during the ratification debates, the

New Hampshire ratification convention proposed an amendment stating that "Congress shall never disarm any *Citizen* unless such as are or have been in Actual Rebellion" (emphasis added), while delegates urged the Massachusetts convention to propose a similar amendment guaranteeing "peaceable *citizens"* the right to keep arms. (emphasis added). 2 Bernard Schwartz, The Bill of Rights: A Documentary History 681, 761 (1971); *see Heller,* 554 U.S. at 604 (considering ratification conventions' proposals). Accordingly, "State constitutions in the early republic continued a similar practice by restricting the right to keep and bear arms to citizens." *Perez,* 6 F.4th at 462-63, *citing* Churchill, *supra,* at 159-60. There is no question but that illegal immigrants have not taken any oath of allegiance.

The Bill of Rights codified this understanding of the right to bear arms as being connected with citizenship as membership in and preservation of the political community. *See McDonald,* 561 U.S. at 769- 70 ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (quoting 3 J. Story, 3038 Commentaries on the Constitution of the United States§ 1890, p. 746 (1833)) (emphasis added)).

In addition, the Second Amendment is connected to the concept of "a well organized militia." However, "the conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller,* 554 U.S. at 628 (emphasis added). *See Perez,* 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining the history that "non-citizens ... were neither expected, nor

usually allowed, to participate in the militia" (quotation marks omitted)); *Jimenez-Shilon,* 34 F.4th at 1047-48 (describing history of "disarmament of groups associated with foreign elements," including "on the ground of alienage" (quotation marks omitted)). There was no suggestion that any states were viewed at the time as lacking the authority to exclude noncitizens from the right to bear arms. *See Bruen,* 142 S. Ct. at 2133 (where there were "no disputes regarding the lawfulness of [certain] prohibitions," one "can assume it settled" that those prohibitions are "consistent with the Second Amendment").

In sum, Section 922(g)(5)(A) disarms noncitizens who are unlawfully present in the United States. It does not "burden a *law-abiding citizen's* right to armed self-defense" in a manner inconsistent with historical precedent. *Bruen,* 142 S. Ct. at 2133 (emphasis added). Instead, the statute fits squarely within a historical tradition that limited Second Amendment rights to particular classes of law-abiding citizens.

### Section 922(g)(5)(A) is sufficiently analogous to historic exclusions to firearms possession.

Although Defendant has not raise the issue as to the federal government not having laws restricting entry into the country until the late 19th century (no aliens illegally in the country at the time of the founding), the government posits that *Bruen's* direction to apply analogous historical precedents establishes the requisite historical tradition.   Even if Section 922(g)(5) is not expressly derivative of the historic exclusions described above (and the government maintains that it is), the statute is still sufficiently analogous to early gun restrictions to support a conclusion that the possession of firearms by unlawful noncitizens is part of this country's historical tradition and is therefore protected under the Second Amendment.

*Bruen's* call for analogical reasoning requires only that the government identify a well-established and representative historical analogue, not "a historical twin." 142 S. Ct. at 2133. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster. While immigration is hardly a new phenomenon, illegal immigration is essentially a phenomenon that began in the late 19th century. *See United States v. Munoz-De La 0*,  No. 2:20-CR-134-RMP-l, 2022 WL 508892, at  *1 (E.D. Wash. Feb. 18, 2022) ("The federal government first forayed into the realm of immigration legislation during the 1870s. One decade later, the 1882 Chinese Exclusion Act prohibited Chinese laborers from  entering  the  United  States  for  ten years.")  *(citing*  Supreme  Court  cases  that upheld  the  exclusion  law  on  the  basis  that illegal  immigrants  could  be  removed  at  any  time);  *see also*  U.S.  Citizenship  and Immigration  Services,  Early  American  Immigration  Policies,  https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (July 30, 2020) ("Americans encouraged relatively free and open immigration during the 18th and early 19th centuries, and rarely questioned that policy until the late 1800s."). When viewed in  light  of  the colonial restrictions on firearms, the laws prohibiting illegal immigrants from bearing arms that followed close on the heels of the  existence of illegal immigrants suggest a long-standing  understanding  that the Second Amendment does  not extend to such individuals.

The immigration  argument  also poses  the  issue in a misleading manner. Section 922(g)(5)(A)  does  not  prohibit  firearm  possession  by  all  immigrants,  but  rather prohibits  immigrants  "illegally  or  unlawfully  in  the  United  States"  from  shipping, transporting,  possessing,  or  receiving  any  firearm  or  ammunition  in  or  affecting

interstate or foreign commerce. 18 U.S.C. § 922(g)(5)(A). Immigration was present in the 18th century, the relevant phenomenon of illegal immigration is one of more recent provenance than the Second Amendment, so that a restriction geared to *illegal* immigrants in the 18th century would not exist. Therefore, the courts must look to *analogous* firearms restrictions during the time of the Second Amendment.

The *Bruen* Court recognized that courts should be mindful of changing societal conditions in evaluating how closely a challenged regulation must conform to historical precedent. "While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen,* 142 S. Ct. at 2132. Given that illegal immigration is an issue that substantially postdates the Second Amendment, the Government need not identify "a dead ringer for historical precursors," but rather must identify only "a well-established and representative historical analogue." *Id.* The Government has done precisely that here, pointing to laws barring Native Americans, Catholics, and Loyalists, as well as others who did not take an oath of allegiance, from bearing arms. While many of these classifications are abhorrent and of course would be unconstitutional today under other constitutional provisions, *Drummond v. Robinson Twp.,* 9 F.4th 217, 228 n.8 (3d Cir. 2021) (quotation marks omitted), they nevertheless show that the right to bear arms was understood to be subject to the government's limitation of that right to those within the political community, i.e., law-abiding citizens.

In sum, even if this Court were to find that Sing-Ledesma, as a non-law-abiding and undocumented noncitizen, is among "the people" to whom the Second

Amendment guarantees the right to bear arms, Section 922(g)(5)(A)'s prohibition on the possession of firearms by undocumented immigrants is consistent with, and analogous to, this Nation's historical practice of denying the right to possess firearms by those deemed outside the political community.

### Obliterated Serial Number
### Summary of Argument

Federal law makes it unlawful to possess a firearm that has moved in interstate commerce where the firearm's serial number is removed, obliterated, or altered. 18 U.S.C. § 922(k). This statute does not violates the Second Amendment under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022). Firearms with obliterated serial numbers are not protected by the Second Amendment because "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller,* 554 U.S. 570, 625 (2008). And there is no lawful purpose for which to possess a firearm with an obliterated serial number. Moreover, § 922(k) is "consistent with the Nation's historical tradition of firearm regulation," *Bruen,* 142 S. Ct. at 2130, because it is analogous to historical laws that regulated commerce in firearms, required inspection and marking of gun barrels and gunpowder, and, most notably, prohibited altering proof marks on gun barrels. The Court should not dismiss § 922(k) because the statute is, at the very least, constitutional as applied to Defendant, an aliens illegally in the United States.

Under the *Bruen* framework, § 922(k) does not burden conduct protected by the Second Amendment's plain text. In interpreting that text, the Supreme Court has definitively said that the Amendment "does not protect those weapons not typically possessed by law abiding citizens for lawful purposes." *District of Columbia v. Heller,* 554 U.S. 570, 625 (2008). And firearms with obliterated serial numbers are *not* typically possessed by law-abiding citizens for lawful purposes.

Indeed, the only reason to possess such a firearm is to evade detection by law enforcement. Because possession of such firearms is not protected by the Second Amendment's plain text, the Court should not dismiss Count 4 of the Indictment brought against Sing-Ledezma. If the Court looks beyond the Second Amendment's plain text, a review of "the Nation's historical tradition of firearm regulation" confirms that § 922(k) is constitutional. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111, 2130 (2022). Colonial and early state governments regulated many aspects of the firearms trade. They heavily regulated the storage and transportation of gunpowder, in some states requiring that powder be inspected and marked. And, notably, two states in the early 1800s required that gun barrels be proved and marked, imposing criminal penalties for altering or removing the proof marks.

Accordingly, § 922(k) satisfies *Bruen's* historical analogue test, which does not require a "historical twin," but considers "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis omitted). Section 922(k) imposes, at most, a limited burden on the right to self-defense because firearms *with* serial numbers are far more common and just as usable as firearms with obliterated serial numbers. And any burden imposed by § 922(k) is comparable in its justification to historical laws, which were designed to prevent firearms from falling into the wrong hands, to prevent firearm accidents, and allow the tracing of firearms and gunpowder to specific inspectors.

In any event, if the Court were to dismiss Count 4 of the Indictment by determining §922(k) is unconstitutional on its face and we assume the statute is unconstitutional in some of its applications, it would at least be constitutional as applied to Defendant, an alien illegally in the United States.

**Argument**

Section 922(k) makes it "unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered" or "to possess or receive" any such firearm that has, "at any time, been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(k). The statute carries a five-year statutory maximum. 18 U.S.C. § 924(a)(l)(B). Congress adopted § 922(k)'s precursor in the Federal Firearms Act of 1938, which made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered." Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251. Congress included an almost identical provision in the Omnibus Crime Control and Safe Streets Act of 1968. Pub. L. No. 90-351, § 902, 82 Stat. 197, 231. It then added the prohibition on "possess[ing]" a firearm with an obliterated serial number as part of the Crime Control Act of 1990. Pub. L. No. 101-647, § 2202(b), 104 Stat. 4 789, 4856. By its terms, § 922(k) does not apply to firearms manufactured or imported without serial numbers before 1968, when Congress required serial numbers on all new and imported firearms. *See* Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1223.

**Possession of a firearm with an obliterated serial number is not conduct protected by the Second Amendment's plain text.**

Under *Bruen,* the first question when considering the constitutionality of a firearms regulation is whether "the Second Amendment's plain text covers an individual's conduct." *Bruen,* 142 S. Ct. at 2126. But that plain text cannot be read in isolation. "[T]he Second Amendment ... codified a *pre-existing* right." *Heller,* 554 U.S. at 592. And the Supreme Court's interpretation of the Second Amendment's plain text in several cases demonstrates that the right does not extend to

possession of a firearm with an obliterated serial number because such a firearm is not "typically possessed by law-abiding citizens for lawful purposes," *id.* at 625, and is not necessary to protect the right to self-defense.

*Heller* explained that "the Second Amendment was not intended to lay down a 'novel princip[e]' but rather codified a right 'inherited from our English ancestors.'" *Heller,* 554 U.S. at 599 (quoting *Robertson v. Baldwin,* 165 U.S. 275, 281 (1897)). The English Bill of Rights, which "has long been understood to be the predecessor to our Second Amendment," did not protect an unlimited right. *Id.* at 593. Instead, it provided that Protestants "may have Arms for their Defense suitable to their Conditions, and as allowed by Law," *id.* (quoting I W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441). Thus, *Heller* explained, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

*Heller* outlined several of the limitations inherent in the Second Amendment's text. It indicated that "prohibitions on carrying concealed weapons" were lawful under the Amendment. *Heller,* 554 U.S. at 626. It said the Court was not calling into question "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. And, as "another important limitation on the right to keep and carry arms," the Court said that the Amendment applies only to "the sorts of weapons" that were "in common use at the time." *Id.* at 627 (quotation marks omitted). Thus, *Heller* said, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

Possession of firearms with an obliterated serial number is not protected by the Second Amendment's plain text for at least two reasons. First, firearms with obliterated serial numbers are not "typically possessed by law-abiding citizens for lawful purposes," even putting aside § 922(k)'s prohibition on such possession. *Heller,* 554 U.S. at 625. As the Third Circuit has observed, "we ... cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm." *United States v. Marzzarella,* 614 F.3d 85, 99 (3rd Cir. 2010). *See* David M. Kennedy et al., *Youth Violence in Boston: Gun Markets, Serious Youth Offenders, and A Use-Reduction Strategy,* 59 Law & Contemp. Probs. 147, 174-75 (Winter 1996) (observing that the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase). Thus, § 922(k)'s burden "will almost always fall only on those intending to engage in illicit behavior." *Marzzarella,* 614 F.3d at 99.

Second, § 922(k)'s prohibition does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Heller* "held that individual self-defense is 'the *central component'* of the Second Amendment right." *McDonald,* 561 U.S. at 767 (quoting *Heller,* 554 U.S. at 599). But "the presence of a serial number does not impair the use or functioning of a weapon in any way." *Marzzarella,* 614 F. 3d at 94. A person desiring to defend himself can do so with either a serialized firearm or a pre-1968 or privately made firearm lacking a serial number. Such firearms are far more common and easier to obtain than those with obliterated serial numbers.

Any burden that § 922(k) imposes on the right to self-defense would be even less burdensome than other regulations that *Bruen* indicated do not infringe on that right. *Bruen* made clear that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the

"shall-issue" firearm carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding responsible citizens.'" *Id.* (quoting *Heller,* 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 922(k)'s ban on possession of firearms with obliterated serial numbers-a small class of hard-to-obtain firearms-is similarly constitutional because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion).

A law-abiding citizen would have no reason to remove a serial number from a firearm. Serial numbers are not a firearm accessory that can easily be removed at will; they are stamped or engraved into the firearm's receiver or frame. Defacing the serial number reduces the firearm's value both by damaging the firearm's original finish and appearance and by making it much more difficult to trace the firearm's provenance and year of manufacture. And removing the serial number makes a firearm far less likely to be recovered if stolen. Only someone attempting to avoid detection of a past or future crime would have a motive to obliterate a serial number. *See Marzzarella,* 614 F.3d at 99. The Second Amendment does not protect such conduct, nor does it protect the right to possess such a firearm.

## Section 922(k) is consistent with the historical tradition of firearms regulation.

Even if the conduct regulated by § 922(k) were presumptively protected under the Second Amendment's plain text, the statute would be constitutional because it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen,* 142 S. Ct. at 2130. As explained below, § 922(k) is analogous to historical laws regulating firearms and gunpowder-most notably laws prohibiting alteration of proof marks on gun barrels.

## Section 922(k) is consistent with historical statutes regulating commerce in firearms and gunpowder and requiring the inspection and marking of gun barrels.

Section 922(k) is consistent with a variety of historical laws regulating firearms and gunpowder. Well before serial numbers became common, colonial and state legislatures regulated firearms and the firearms trade. *See Teixeira v. Cnty. of Alameda,* 873 F.3d 670, 685 (9th Cir. 2017) (en banc) ("[C]olonial governments substantially controlled the firearms trade."). For example, Connecticut banned residents from selling firearms outside the colony. *Id.* Virginia provided that people were at "liberty to sell arms and ammunition to any of his majesties loyal subjects *inhabiting this colony." Id.* at 685 n.18 (emphasis added; quotation marks omitted). And at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also* 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (1763 law); Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Although not an exact analogy to § 922(k), these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands.

Additionally, several states had laws relating to the inspection and marking of gunpowder, which "was essential to the operation of firearms at that time," meaning that gunpowder regulations "necessarily affected the ability of gun owners to use firearms for self-defense." *Miller et al v. Banta, et al.,* No. 3:19-cv-1537 (S.D. Cal. 2022) (Dkt. 137-3, at 22) (Declaration of Prof. Saul Cornell); *cf. Bruen,* 142 S. Ct. at 2149 (citing article by Cornell). In 1795, Pennsylvania enacted a law requiring gunpowder stored in the public magazine to be proved and marked and prohibiting importation, transfer, or sale of any gunpowder that was not appropriately marked. 3 Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred 240-44 (1810). In 1809, Massachusetts required the inspection of all gunpowder manufactured in the commonwealth or stored in a public magazine, with the inspector marking each cask as either "Massachusetts Inspected Proof" or "Condemned" and adding his name and the year. 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823). The law imposed a fine of between $200 and $500 on any person who sold any condemned powder or "fraudulently alter[ ed], or deface[ d] any mark, or marks, placed by any inspector upon any cask or casks containing gunpowder." *Id.* New Hampshire adopted a very similar law in 1820. Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

Colonial and early state governments likewise prohibited the manufacture and transportation of gunpowder without a license. *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) (1651 statute) ("no person ... shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890) (1775 statute) (no "gun-powder made and manufactured ... shall be exported out of the [Colony] without ... license"); The Charter

and Ordinances of the City of Providence, with the General Assembly Relating to the City 37 (1835) (1821 law) (prohibiting selling gunpowder within the town of Providence "without having a license therefor").

Most importantly, at least two states in the early republic required gun barrels to be proved and marked and prohibited the obliteration of the proof marks. *See Heller,* 554 U.S. at 605 (observing that examining the "public understanding of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation" (emphasis omitted)). In 1805, Massachusetts adopted a law for the appointment of "provers of fire arms" to "prove all musket barrels and pistol barrels" presented to them in exchange for a set fee. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259 (1807). The law was adopted to prevent firearms from being "introduced into use which are unsafe, and thereby the lives of the citizens be exposed." *Id.*

Under the Massachusetts law, the prover was required to "stamp" the barrel "within one and an half inches of the breech" with the prover's initials, the letters "P." and "M.," and the year- all in "letters and figures ... so deeply impressed ... as that the same cannot be erased or disfigured." Laws of the Commonwealth of Massachusetts, *supra,* at 260. The act imposed a ten dollar fine on any person who manufactured within the Commonwealth "any musket or pistol, without having the barrels proved and stamped as aforesaid." *Id.* at 260. It also imposed a ten-dollar fine for selling, delivering, or purchasing any unmarked musket or pistol manufactured in the Commonwealth. *Id.* at 260-61. And it imposed a fine of between $20 and $50 for any person who "shall falsely forge or alter the stamp of any prover of firearms ... impressed on any musket or pistol barrel." *Id.* at 261. Massachusetts slightly amended this act in 1814 but kept the provision prohibiting alteration

of the prover's stamp. Laws of the Commonwealth of Massachusetts from February 28, 1807 to February 28, 1814 at 536-37 (1814).

Similarly, Maine in 1821 passed a law requiring the appointment of "suitable persons, to be provers of the barrels of all new, or unused firearms." Laws of the State of Maine 546 (1830). Each prover was required (in exchange for compensation) to "prove and try the strength of the barrels of all firearms which shall be offered to him for that purpose, in such manner as to satisfy himself of the strength of the same," to "in a permanent manner, mark and number every barrel by him so proved," and to provide a certificate attesting to the proof. *Id.* The statute imposed a ten-dollar fine on any person who "shall sell or offer for sale within this State, any new, or unused musket, rifle or pistol barrel, without having the same first proved, marked and certified." *Id.* Additionally, it imposed a fine of "not more than one hundred dollars, nor less than twenty dollars," for any person who "shall falsely alter the stamp or mark or the certificate of any prover of firearms." *Id.* Although these statutes are not identical to § 922(k), they are "relevantly similar." *Bruen,* 142 S. Ct. at 2132. *Bruen* made clear that the government need only identify a "historical *analogue,* not a historical *twin." Id.* at 2133.  The ultimate question is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. As explained above, § 922(k) imposes a minimal "burden on the right of armed self-defense" because marked firearms are ubiquitous and just as effective for self-defense as unmarked firearms. That burden is no greater than the burdens imposed by historical laws relating to the sale and marking of firearms and gunpowder. And neither the historical laws nor § 922(k) deprived citizens of the use of firearms for self-defense. *See Holton,* 2022 WL 16701935, at *5 (observing that *"[n]ot removing* the serial number from a firearm" is a "negligible burden" compared to historical restrictions on firearm possession).

Section 922(k) is also "comparably justified." The historical regulations on commerce in firearms were designed to keep firearms out of the hands of those who might be dangerous, such as (in the view of legislators at the time) Native Americans. And the laws requiring marking of gun barrels and gunpowder were designed to protect citizens from explosions and to allow unsafe barrels or powder to be traced to the inspector who first affixed the markings. Section 922(k) serves similar purposes by allowing authorities to recover stolen firearms and trace firearms that have been used in a crime. *See Marzzarella,* 614 F.3d at 98; *United States v. Mobley,* 956 F.2d 450, 454 (3d Cir. 1992). Although § 922(k) does not reflect precisely the same legislative priorities as these historical regulations, it nevertheless imposes a "comparable burden" that is "comparably justified." *Bruen,* 142 S. Ct. at 2133.

## Conclusion

For the above stated reasons and analysis, the government respectfully requests the Court deny in all things Defendant's Motion to Quash Counts 1,3, and 4 of the Indictment.

Respectfully submitted,

JAIME ESPARZA
UNITED STATES ATTORNEY

By:   *Stanley M. Serwatka*
STANLEY M. SERWATKA
Assistant U.S. Attorney
Texas Bar #18038400
700 E. San Antonio, Suite 200
El Paso, Texas 79901
(915) 534-6884

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2023, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Eduardo Solis,
Attorney for Defendant

*Stanley M. Serwatka*

STANLEY M. SERWATKA
Assistant United States Attorney