IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| VS. | § | **NO.: EP-23-CR-00823 KC** |
| | § | |
| | § | |
| ANTONIO SING-LEDEZMA | § | |

## DEFENDANT'S REPLY BRIEF TO GOVERNMENT'S <u>RESPONSE TO DEFENDANT'S MOTION TO QUASH</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Defendant Antonio Sing-Ledezma and files this his Reply Brief to the Government's Response to Defendant's Motion to Quash Counts 1 and 4 of the Indictment.

Defendant Sing-Ledezma withdraws any challenge and motion to quash and dismiss count 3 of the indictment.

## I.

The decision and resolution of the issues raised by Defendant Sing-Ledezma rest on the *Bruen* decision, which this court and the government, as well as legal observers and commentators, are well familiar with one year in and counting into

the Supreme Court's decision in *United States v. Bruen*, 597 U.S. __, 142 S.Ct. 2111, 213 L.Ed. 2d 387 (2022).

The Supreme Court in *Bruen* followed, and referenced throughout, *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), in pointing out that these seminal cases recognize that the Second and Fourteenth Amendments protect a citizen's right to possess a handgun in their home for self-defense.[1]  Following both these cases, *Bruen* held that the Second Amendment and the Fourth Amendment also protect an individual's right to carry a handgun for self-defense outside of the home.

The *Bruen* court, Justice Thomas writing for the majority, applied a textual and historical analysis of the Second Amendment in reaching its decision. Significantly, and what appears to be the gravamen of the *Bruen* decision, the Court specifically rejected a "means-end scrutiny" that is often applied by courts in determining the constitutionality of laws that impact on constitutionally protected behavior.   *Bruen* marked a salient and dramatic shift in post-*Heller* Second Amendment jurisprudence, by expressly rejecting the "means-end scrutiny" analysis and instead instructing courts to assess "constitutional text and history." *Bruen*, 142 S.Ct. at 2128-29.   The *Bruen* court instructs that if "the Second

---

[1] Justice Thomas noted that Heller's textual and historical analysis of the 2nd Amendment conferred the right to keep and bear arms on the individual regardless of service in the militia. 554 U.S. at 592, 595.

2

Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects the conduct." *Id.* at 2129-30.  The government must then rebut the presumption and show that a challenged law or regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.*   This historical test is a demanding one: a firearm regulation is consistent with the American tradition only if similar regulations were widespread and commonly accepted during the founding era, when the Second Amendment was adopted.

Under the new framework established by *Bruen*, this Court should dismiss the count 1 and count 4, which charge Defendant Sing-Ledezma with 18 U.S.C. 922 (g)(5)(A) – Alien in Possession of a Weapon and 18 U.S.C. 922 (k) – Possession of a Firearm with Obliterated Serial Number, respectively.

## II.

*18 U.S.C. 922 (g)(5)(A)*

As it concerns 18 U.S.C. 922 (g)(5)(A) – Alien in Possession of a Weapon, the government essentially argues that Defendant Sing-Ledezma is not part of "the people" protected by the Second Amendment, owing to his status as an undocumented alien (UDA).  The government argues that Defendant Sing-Ledezma is of a class of *non*members of the "political community," who can then be denied the protections of the Second Amendment.

The government then argues that the restrictions of 922(g)(5)(A) are consistent and similar to relevant historical practice around firearms regulation, in that "nonmembers of the political community" have been historically denied the right to firearms possession by colonial and Founding-era legislatures, thus making 922(g)(5)(A) restrictions consistent with historical firearms restrictions.

Defendant Sing-Ledezma respectfully avers that because the Second Amendment applies to noncitizens, and because the government cannot point to a historical tradition of denying noncitizens such as Defendant Sing-Ledezma the right to bear arms, as is now required under the *Bruen* framework, § 922(g)(5)(A) is unconstitutional on its face and as applied to Defendant Sing-Ledezma.

### III.

*18 U.S.C. § 922(k)*

As it concerns 18 U.S.C. § 922(k), the government argues that § 922(k) does not violate the Second Amendment and survives *Bruen*.  The government essentially contends that firearms with obliterated serial numbers are not possessed by "law-abiding" citizens and thus are subject to regulation and prohibition. The government argues the regulation of firearms with obliterated serial numbers under § 922(k) is analogous to historical laws that regulated commerce in firearms, required inspection and marking of gun barrels and gunpowder, and "prohibited

altering proof marks on gun barrels." The government, in its response to Defendant Sing-Ledezma's Motion to Quash/Dismiss, then conflates the argument(s) for finding § 922(k) constitutional with Defendant Sing-Ledezma's status as an undocumented alien.

## IV.

## STATEMENT OF FACTS

On March 31, 2023, El Paso Police responded to a shots fired call in the area of 1300 block of George Dieter Drive in El Paso, Texas. On arriving at the vicinity of the scene, EPPD observed a vehicle driving erratically and subsequently conducted a traffic stop on a Chevy Malibu. The driver of the Chevy Malibu was identified as the Defendant, Antonio Sing-Ledezma. Defendant Sing-Ledezma advised the officers he had been shot in the leg, and the officers did observe a bullet hole in the driver's side door of the Chevy Malibu. The officers had Defendant Sing-Ledezma exit Chevy Malibu and patted down Defendant Sing-Ledezma for weapons. A K-9 unit was called to the scene and arrived shortly thereafter. The canine alerted to smell of narcotics and a subsequent search of Defendant Sing-Ledezma's vehicle and his person resulted in the seizure of one round of .380 caliber Federal ammunition inside Defendant Sing-Ledezma's left jacket pocket, one (1) glass pipe in his left jacket pocket, and marijuana in his pants pocket. A search of the Chevy Malibu resulted in the seizure of .072 ounces

of marijuana, eleven (11) rounds of .380 caliber Federal ammunition and a .380 caliber pistol with an obliterated serial number. Five spent .380 Federal caliber casings were located in the immediate area where the traffic stop occurred. A check of court records determined that Defendant Sing-Ledezma had been convicted of improper entry by an alien pursuant to 8 U.S.C. § 1325, a misdemeanor, on December 28, 2016 and sentenced to time-served.  Further checks revealed that Defendant Sing-Ledezma has not been granted authorization or permission to enter the United States since his removal from the United States on December 31, 2016. Defendant Sing-Ledezma was transported to University Medical Center where he was determined to have suffered a superficial injury to his leg and he was medically cleared.

Defendant Sing-Ledezma stated he was headed down Zaragoza Boulevard in El Paso, Texas when a blue Chrysler 300 tried to hit his vehicle which Sing-Ledezma described as a road rage incident. In an effort to get away from the Chrysler, he turned right at the light at the intersection of Zaragoza and George Dieter, and because the Chrysler was trying to hit him, Defendant Sing-Ledezma was forced to either eventually continue forward or turn left on George Dieter, forcing him to evade the Chrysler which was firing shots from inside the vehicle at Defendant Sing-Ledezma. Defendant Sing-Ledezma drove onto the 1320 George Dieter parking lot (Fred Loya Insurance) to avoid the gunfire coming from the

Chrysler, and as he did so, he was shot through the driver's door by the occupant(s) of the blue Chrysler.

Defendant Sing-Ledezma initially came to El Paso, Texas in 2006 and was deported in 2016.  At the time of his arrest, Defendant Sing-Ledezma was living in El Paso, Texas with his common law spouse, Claudia Hernandez, and his daughter Claudia.  Defendant Sing-Ledezma stepdaughter, Claudia's daughter from another relationship, was also residing with Defendant Sing-Ledezma and Claudia and his biological daughter. Defendant Sing-Ledezma had been living with his family here in El Paso since 2020. Defendant Sing-Ledezma has two sisters that live in El Paso, Carmen Ledezma and Susana Sing, who live in San Elizario, Texas and Socorro, Texas, respectively.  Defendant Sing-Ledezma has been employed in El Paso, Texas as a roofer, with UTX Roofing.  Defendant Sing-Ledezma has worked jobs in El Paso and in other Texas cities involving construction, roofing, plumbing, painting, drywall, among other trades.

## V.

## DEFENDANT SING-LEDEZMA'S REPLY TO GOVERNMENT'S 18 U.S.C. § 922(g)(5)(A) ARGUMENT

This Court must first determine what kind of evidentiary showing will satisfy the government's burden in this case. As referenced above, *Bruen* explains that the historical inquiry will vary depending on the challenged regulation.

On the one hand, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be relatively straightforward." *Bruen*, 142 S.Ct. at 2131.   *Bruen* instructs that the inquiry should begin by deciding whether "a distinctly similar historical regulation address[ed] the problem." *Id*.   If earlier generations did not regulate the problem, or if they regulated it "through materially different means," then the challenged regulation may violate the Second Amendment. *Id*.

However, if a regulation implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the inquiry will require "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2132-33.   So then, "whether modern and historical regulations impose a comparable burden on the right to self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id*. at 2133. (emphasis in the original).   The *Bruen* decision stressed the limits of analogical reasoning, noting "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id*. at 2133.

Whether the government's burden requires a "distinctly similar" precursor or "relevantly similar" historical analogue, the "comparable tradition of regulation"

must be clear and robust; a historical tradition cannot rest on historical outliers. *Bruen*, 142 S.Ct. at 2153, 2156.   The government must instead demonstrate historical regulations that were *both* commonly accepted and actually enforced. See *Bruen*, 142 S.Ct. at 2142 (expressing "doubt" that statutes from only three of the original thirteen colonies would be sufficient to establish a relevant tradition).

Finally, *Bruen* places the burden on the government to affirmatively prove the historical tradition justifying a challenged firearm regulation. *Bruen*, 142 S.Ct. at 2127, 2130.   Courts "are not obliged to sift the historical materials for evidence to sustain [a] statute[]," *id*. at 2150; and those subject to the challenged regulation(s) do not bear the burden of delineating the extent of the Second Amendment right. *Id*. at 2130.

## Argument

### A. Undocumented aliens are "people" under the Second Amendment. The Second Amendment applies to undocumented aliens unlawfully present in the United States.

First, "[n]othing in the Second Amendment's text" suggests that noncitizens within the United States are not part of "the people" who have the right to keep and bear arms.   *Bruen*, 142 S.Ct. at 2134.   In rejecting an analogous argument, the Supreme Court has held that "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term." *Plyer v. Doe*, 457 U.S.

9

202, 210-11 (1982).   This is owing to the tenet that constitutional rights are "universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Wong Wing, v. United States*, 163 U.S. 223, 238 (1896) (holding that "all persons withing the territory of the United States are entitled to the protection guaranteed by those amendments").

The phrase, "the people," found in the Preamble and in the First, Second, Fourth, Ninth, and Tenth Amendments of the United States Constitution, is a term of art. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990).  The Supreme Court has defined "the people" as "a class of persons wo are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *Verdugo-Urquidez*, 494 U.S. at 265.   In *Heller*, the Supreme Court also approved of this definition in the context of the Second Amendment. *Heller*, 554 U.S. at 580.   In *Kanter v. Barr*, 919 F.3d 25, 437, 452 (7th Cir. 2019) (Barrett, J., dissenting), then Judge Barrett explained that "It is one thing to say that certain weapons or activities fall outside of the scope of that right. It is another to thing to say that certain people fall outside of the Amendment's scope."   It is evident, given the case authority, that noncitizens (undocumented aliens) "receive constitutional protections when they have come within the territory of the United States and developed substantial connections with

10

this country." *Verdugo-Urquidez*, 494 U.S. at 271.   In short, noncitizens (undocumented aliens) are part of the "people" under the Second Amendment's plain text.

**B.   There is no historical tradition of stripping noncitizens (undocumented aliens) of their right to bear arms, thus the government cannot meet its heavy burden to show otherwise.**

Defendant Sing-Ledezma falls within the Second Amendment's plain language that possession of a firearm is "presumptively guarantee[d]," and the government bears the burden to prove § 922(g)(5)'s prohibition "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2135.

In the instant case, the possibility that noncitizens (undocumented aliens) will cause harm using firearms is "a general societal problem that has persisted since the 18th century." *Id*. at 2131. Thus, the government must point to historical regulations that are "distinctly similar" to disarming people from their right to possess a firearm based on their non citizenship status for § 922(g)(5)(A) to pass constitutional muster. *Id*. at 2131.

The United States has no historical tradition of preventing immigrants of any status from owning guns.  To the contrary, colonies often required immigrants to have guns. The Founders reinforced that, just like citizens, noncitizens (historical documents use the term "aliens"), have "all the common privileges." James

Madison, *The Virginia Report of 1799-1800: Touching the Alien and Sedition Laws* 205 (1850 ed.).

During the colonial period, indigenous populations and black slaves were "regarded as a threat to the established order, and even free blacks were suspect. Their inability to legally own weapons merely confirmed their status as outsiders and inferiors. . ." Joyce Lee Malcolm, To Keep and Bear Arms 141 (1994).[2]  It was a status based on race, *not* citizenship or non-citizenship.[3]

In the Antebellum and Reconstruction periods that followed, although widely discriminated against and were feared to be violent, Irish and Chinese immigrants did not face gun prohibitions, regardless of their non-citizenship status. The first bans on immigrant gun ownership, in fact, appeared in the 1910s, nearly a century and a half after the Founding.  There is no "distinctly similar historical regulation" to 18 U.S.C. §922(g)(5) prohibiting noncitizens (UDAs) from bearing arms; and the government cannot conclusively show otherwise.  For this reason, as

---

[2] Northern colonies at that time generally followed an ambivalent view about allowing the black population owning firearms. Colonies such as Massachusetts, Connecticut, and New Jersey permitted black people that were not enslaved from possession firearms; Virginia allowed black people that were not enslaved to possess one firearm in their home. Malcolm at 140-41 (omitting citations).

[3] Some courts, in undertaking a *Bruen* analysis reject historical status bans prohibiting racial, religious, and political minorities from possessing firearms as meaningful justification for modern status bans.  See *Range v. Attorney General*, 69 F.4th at 96, 104-05 (3d. Cir. 2023) (dismissing an analogy between Founding-era governments disarming "distrusted" groups and modern felon disarmament as too broad); see also *United States v. Hicks*, No. 21-0060, 2023 WL 164170 (W.D. Tex. Jan. 9, 2023) at *6-7 (criticizing the government for citing race-based disarmament laws as historic analogue). In *Range*, the court held historic status bans could not justify modern status bans based on dissimilar characteristics. 69 F.4th at 104-05 (rejecting historical status bans because "the Government [did] not successfully analogize those groups to Range and his individual circumstances."

*Bruen* instructs, 18 U.S.C. §922(g)(5) is unconstitutional under *Bruen* and the original understanding of the Second Amendment.

> **C.     No historical tradition existed of prohibiting authorized or unauthorized immigrants from keeping and bearing arms during the Colonial, Founding, Antebellum, and the Reconstruction eras in what is now the United States of America.**

Without the strong military protection afforded other world colonies, American colonies were essentially, and practically, required to arm themselves: "The emphasis of the colonial governments was on ensuring that the populace was well armed, not on restricting individual stocks of weapons," and "on the duty to be armed and a freer use of private firearms than existed in England." Malcolm at 140.  The colonies generally required that men be armed, which included citizens and noncitizens, whether indentured servants or free. Colonial laws "required firearms ownership by any head of a household," plus "at least one firearm for every male in the household age 16 or over," "[i]ncluding free servants and indentured servants." David Kopel, *The American Indian Foundation of American Gun Culture*, Wash. Post (Nov. 21, 2017) (essay based on Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (2d ed. 2017)).

As an example, in what is now North Carolina, South Carolina, and Georgia, the colonies actually required immigrants be "armed with a good musket full bore,

10 pounds of powder and 20 pounds of bullet."   Kopel (quoting *A Brief Description of the Province of Carolina* (1666), reprinted in David C. Douglas, 9 *English Historical Documents: American Colonial Documents to 1776* (1955)). Otherwise, land grants were denied to those immigrants who did not arm themselves.

Another example would be the law established in the settlement of Newport in 1639 that required that "Noe [sic] man shall go two miles from the Towne unarmed, eyther [sic] with a Gunn or Sword; and that None shall come to any public Meeting without his weapon." Malcolm at 139 (quoting *Records of Colony of Rhode Island*, 1:94).

A third example was Connecticut's order that householders "always be provided with and have in continual readiness a well-fixed firelock . . . or other good fire-arms . . . one pound of good powder, four pounds of bullets fit for his gun, and twelve flints."  *Id*. (quoting *Records of Colony of Connecticut*, 8:380).

Yet another example is the colony of Georgia in 1770, where every male resident was required to "carry firearms to places of public worship." Malcolm at 139 (citing to *The Colonial Records of the State of Georgia* (Atlanta, 1904-1910), vol. I, XIX, part I,137-139)).

These are but a small list of examples that emphasize that rather than prohibiting immigrant gun ownership, colonial America enacted many

regulations encouraging – and even requiring – immigrant gun possession.

### D.    Founding-era and post-ratification legal commentators acknowledged and defended noncitizens' right to bear arms.

The early states continued the colonial tradition of no prohibitions on immigrants' rights to keep and bear arms, regardless of status. This alone is determinative of the historical inquiry under *Bruen*.

Indeed, two leading figures at the founding of our nation explained the common understanding that noncitizens had the same individual rights as citizens.

James Madison, in the Report of 1800, explained the Founders' understanding that noncitizens were protected by the Bill of Rights. He was reacting to the constitutional crises created by the Alien and Sedition Acts of 1798. *See* Anna Su, *Speech Beyond Borders: Extraterritoriality and the First Amendment*, 67 Vand. L. Rev. 1373, 1395-98 (2014). The Alien and Sedition Acts tested the boundaries of the First Amendment for the first time following the Bill of Rights' passage. The Acts criminalized speech critical of the government, and they created special penalties for "aliens." *Id.* Writing for the Virginia Legislature, Madison explained that the Acts violated citizens' and noncitizens' constitutional rights to the same degree. He disagreed with the Acts' suggestion that "aliens" were not protected by the Bill of Rights and the common law to

the same degree as citizens.

Madison wrote:

> Again, it is said, that aliens not being parties to the Constitution, the rights and privileges which it secures cannot be at all claimed by them.
>
> To this reasoning, also, it might be answered, that although aliens are not parties to the Constitution, it does not follow that the Constitution has vested in Congress an absolute power over them. The parties to the Constitution may have granted, or retained, or modified the power over aliens, without regard to that particular consideration.
>
> But a more direct reply is, that it does not follow, because aliens are not parties to the Constitution, as citizens are parties to it, that whilst they actually conform to it, they have no right to its protection. Aliens are not more parties to the laws, than they are parties to the Constitution; yet, it will not be disputed, that as they owe, on one hand, a temporary obedience, they are entitled in return to their protection and advantage.
>
> If aliens had no rights under the Constitution, they might not only be banished, but even capitally punished, without a jury or the other incidents to a fair trial. But so far has a contrary principle been carried, in every part of the United States, that except on charges of treason, an alien has, besides all the common privileges, the special one of being tried by a jury, of which one-half may be also aliens.

Madison at 205.

St. George Tucker, an antifederalist and leading legal scholar of the era, also emphasized that the right to bear arms applied to citizens and noncitizens alike. Tucker supported citizens and noncitizens right to bear arms in what *Heller* describes as "the most important early American edition of Blackstone's Commentaries," and upon which *Heller* relies extensively. *See* 554 U.S. at 594–95, 606 (discussing Blackstone's Commentaries (1803), ed. St. George Tucker ("Tucker's Blackstone")). Tucker "conceived of the Blackstonian arms right as necessary for self- defense." *Heller*, 554 U.S. at 606. He "equated that right . . . with

the Second Amendment," *id.*, and described it as "a natural right," Tucker's

Blackstone at 145-47, n.42.[4]  Tucker believed that the right to bear arms in self-

defense is a natural right, and that the right to bear arms "appertain[s] to every

man, as a moral agent." *Id*. Tucker believed that, like other natural and social

rights, the right to bear arms extends to "in all civilized nations, all free persons,

whether citizens or aliens." *Id*.

Tucker took great pains to emphasize that "aliens" were protected by the

individual constitutional right in the Second Amendment. As was Madison, Tucker

was concerned that the Alien and Sedition Acts violated the constitutional rights

"in the most flagrant and unjustifiable degree" of those considered "aliens." *Id.* In

Note D, he explained, the "articles of the amendments to the constitution, most

clearly designate, that aliens, as *persons*, must be entitled to the benefits therein

secured to all *persons* alike." *Id.* at 10 Note D (emphasis in original).  Tucker

explained that it was "the province of the judiciary to pronounce whether" a "law

passed by congress prohibiting . . . the right of the people. . . to keep and bears

arms" was "constitutional, or not" – not including when such laws applied to

"any the subject of a nation with whom the United States were at that time at

peace." 1 *id.*, Note D.   Simply put, the United States had no tradition in the

---

[4] St. George Tucker's Blackstone Commentaries (transcriptions), *available at* http://constitution.org/1-Constitution/tb/tb-0000.htm (last accessed Sep. 20, 2023). The citations to Note D are in the modern editor's Sections 12, 13, and 16. The citations to Note D in this motion are in the modern editor's Sections 12, 13, and 16.

Founding era of prohibiting immigrants of any status from owning guns.

   **E.   Antebellum-era and Reconstruction-era laws allowed citizens and noncitizens to possess firearms.**

   There was no tradition of prohibiting noncitizens from possessing firearms during the Antebellum- and Reconstruction-era. As was true in the Colonial and Founding eras, states still had no gun-prohibition laws targeting noncitizens of any status.

   The lack of laws prohibiting immigrants from having guns is significant considering widespread concerns about immigration and immigrant-related violence in the nineteenth century, and similarly immigrants' needs to defend themselves against mob violence in this period. Immigrants, whether lawful or unlawful, retained their right to keep and bear arms.   In the nineteenth century, a growing sentiment led to the belief that Irish and Chinese immigrants were both poor and violent, in addition to some being unlawfully present. *See* Kevin Kenny, *Race, Violence, and Anti-Irish Sentiment in the Nineteenth Century* (2007) (describing stereotypes of the "Irish savage," prone to violence); Lucy Salyer, *Laws Harsh as Tigers: Chinese Immigrants and the Shaping of Modern Immigration Law* (1995) (discussing stereotypes of Chinese immigrants as "inferior"). Even so, all noncitizens retained their right to bear arms. As a result, "musket wielding" Irish immigrants were able to defend themselves during anti-immigrant mobs of the

1800s, such as the Philadelphia Bible Riots of 1844. *See* Christopher Klein, *When American Despised the Irish: The 19th Century Refugee Crisis* (2019). This also extended to the West Coast. *See* Beth Lew-Williams, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America* 91-168 (2018) (describing mob violence and Chinese immigrants' efforts to defend themselves).

In the Antebellum and Reconstruction eras, San Francisco city leaders and newspapers regularly put Chinese immigrants at the "center of the debate over gun control in San Francisco." Joselyn Huerta, *Control of Violence, Control of Fear: The Progression of Gun Control in San Francisco, 1847-1923*, 48, 32-50 (2015). Yet the city passed neutral laws in response, not ones that targeted noncitizens. In responding to a raid for concealed weapons in Chinatown, the *San Francisco Chronicle* warned that the raid's focus on Chinese immigrants was unconstitutional. It wrote that while "Chinese immigration was 'a curse,' the Chinese were nevertheless, entitled to the protection of the law under which they live." *Id.* at 32, sounding very much like Madison's defense decades earlier.

In sum, in Colonial, Founding, Antebellum, and Reconstruction eras of what is the United States of America, there was no historical tradition of prohibiting either immigrants with or without lawful status from keeping and bearing arms. Because citizens and noncitizens alike enjoyed the right to bear arms as part of this "historical tradition," that tradition "delimits the outer bounds of the right to keep

19

and bear arms" today. *Bruen*, 142 S. Ct. at 2127.

**F.    Prohibitions on immigrants' gun possession are the creation of the twentieth-century without historical basis or precedent.**

The twentieth century saw the first regulations prohibiting *any* immigrants from having firearms as a class. Under *Bruen*, this history "come[s] too late to provide insight into the meaning of the Constitution." *Bruen*, 142 S. Ct. at 2137 (quoting *Spring Comms. Co. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting)) (simplified). The first set of laws prohibiting immigrants from keeping and bearing arms were enacted by states.  In the "early 1900s, as anti-immigrant sentiment spread, many states enacted laws aimed at keeping guns from non-citizens." Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Problems 55, 72 (2017) (identifying no immigrant gun prohibitions before 1900); *see* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272-73 (2020) (same).

More relevant here, the original Gun Control Act which regulated distribution of firearms, did not include a category regulating possession by a noncitizen. It was only as part of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968 that Congress barred possession by noncitizens. Pub. L. 90-951, tit. VII, § 1202(a), 82 Stat. 236 (1968). The "last-minute" possession prong

amendment to the 1968 crime bill for all prohibited categories was "hastily passed, with little discussion, no hearings and no report." *United States v. Bass*, 404 U.S. 336, 344 (1971). It banned "felons, veterans who are other than honorably discharged, mental incompetents, aliens who are illegally in the country, and former citizens who have renounced their citizenship." 82 Stat. 236. Congress passed the legislation in response to, among other things, the noncitizen Sirhan Sirhan's assassination of Senator Robert Kennedy. *See Huddleston v. United States*, 415 U.S. 25 814, 825 (1974). Prior to 1968, there was no federal or blanket nationwide criminal prohibition on citizens or noncitizens from possessing firearms based solely on immigration status. Congress did not graft the noncitizen possession to the 18 U.S.C. § 922(g) scheme until 1986 when it became § 922(g)(5)(A). Given the rights noncitizens enjoyed prior to the twentieth century, that included the individual right to bear arms regardless of immigration status, there is simply no "historical tradition" of gun regulation of immigrants "distinctly similar" to § 922(g)(5). *See Bruen*, 142 S. Ct. at 2130-31. The government cannot meet its burden to show otherwise.

In sum, the government cannot "meet [its] burden to identify an American tradition" that prohibited unlawfully present noncitizens from possessing firearms, thus, 18 U.S.C. § 922(g)(5) "is therefore unconstitutional." *Bruen*, 142 S. Ct. at 2138. This Court, at a minimum, should dismiss count 1 of the indictment because

the government cannot present evidence of a historical tradition that would have prohibited a person in Mr. Sing-Ledezma's circumstances from possessing a firearm.

## VI.

## DEFENDANT SING-LEDEZMA'S REPLY TO GOVERNMENT'S 18 U.S.C. § 922(k)ARGUMENT

As discussed above in relation to count 1 of the indictment in this cause, before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms.  *Bruen* expressly rejected that approach, instructing courts to only consider "constitutional text and history." 142 S. Ct. at 2128-29.  If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.*  at 2129-30. And, as discussed above, the test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted during the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, the Court should

dismiss count 4 the indictment against Defendant Sing-Ledezma, which charged possessing a firearm which had the manufacturer's serial number removed under 18 U.S.C. § 922(k).   Because possession of a firearm comes within the Second Amendment's "plain text," Defendant Sing-Ledezma's conduct is presumptively protected. Defendant contends that the government will be unable to rebut that presumption. Manufacturer serial number laws, requirements, and removal prohibitions with regard to firearms were only adopted in 1968. (Pub. Law 90-618, Sec. 102, 82 Stat. 1213, 1220 – effective October 22, 1968.).

**Argument**

**A.     Under the framework announced in *Bruen*, § 922(k) violates the Second Amendment right to keep and bear arms.**

The Second Amendment's "plain text" does not distinguish between bearing arms that have manufacturer's serial numbers and those which do not, and a prohibition and even criminalization of possessing a firearm with the manufacturer's serial number removed presumptively violates the Second Amendment.   Defendant Sing-Ledezma contends that the government has not, in its response to Defendant Sing-Ledezma's motion to dismiss count 4 of the indictment, been able to rebut that presumption.   As discussed above, manufacturer serial number laws consisting of serial number requirements and serial number removal prohibitions were only adopted in 1968 and were equally unknown to the

founding fathers' generation. 18 U.S.C. § 922(k) – which prohibits the possession of firearms without manufacturer's serial numbers - was enacted as part of Pub. Law 90-618, Sec. 102, 82 Stat. 1213, 1220 – effective October 22, <u>1968</u> (further amending Chapter 44 of Title 18 as part of the second version of the 1968 Gun Control Act).   It is evident then that § 922(k) and the manufacturer serial number requirement is certainly *not* a longstanding firearm prohibition; and is certainly not one that existed when the Second Amendment was ratified.   Which is why, post-*Bruen*, this Court should dismiss count 4 of Defendant Sing-Ledezma's indictment with prejudice.

In its response to Defendant Sing-Ledezma's Motion to Quash/Dismiss, the government argues that firearms with obliterated serial numbers are not protected by the Second Amendment because "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller,* 554 U.S. 570, 625 (2008). The government further argues that there is no lawful purpose for which to possess a firearm with an obliterated serial number.   The government also argues that § 922(k) is "consistent with the Nation's historical tradition of firearm regulation," *Bruen,* 142 S. Ct. at 2130, referencing, ostensibly, analogous historical laws that regulated commerce in firearms, required inspection and marking of gun barrels and gunpowder, and regulations and law that prohibited altering proof marks on

gun barrels.  The government also, as referenced above, conflates the argument for the constitutionality of § 922(k) with § 922(g)(5)(A), by arguing § 922(k) is constitutional owing to Defendant Sing-Ledezma's status as an undocumented alien.

In applying the *Bruen* test, the District Court in the Western District of Texas noted:

> But in *Bruen*, Justice Thomas stated the two-step approach was one step too many.  In its place, Justice Thomas [elucidated] a new standard courts must follow: *When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.*  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.  So[,] *the threshold question is whether the Second Amendment's plain text covers Defendant's conduct*.

*United States v. Quiroz*, 4:22-cr-00104-DC, Order, ECF No. 82 at p. 4 (W.D. Tex. Sept. 19, 2022 (internal citations omitted), emphasis added.

Applying the *Bruen* test, "the government may not simply posit that [a] regulation promotes an important interest." 142 S. Ct. at 2126.  This test requires courts to "consider whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at 2132.  In the event that there are "multiple plausible interpretations" of an ambiguous historical record, a reviewing court must "favor the one that is more consistent with the Second Amendment's

command." *Id.* at 2141 n.11; *see also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend [a statute]"). The "[g]overnment bears the burden" of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

Thus, as to the government's argument that § 922(k) is a commercial regulation not subject to protection of the Second Amendment, Defendant Sing-Ledezma's response is that § 922(k) criminalizes the mere possession of a firearm after a serial number is removed. In *United States v. Price*, No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571, 2022 WL 6968457 (S.D.W.Va. Oct. 12, 2022), where the district court found § 922(k) to be unconstitutional after applying the *Bruen* test, the court held: "Other commercial regulations [for example 18 U.S.C. § 923(i)] may well require that any firearm sale only involve firearms bearing a manufacturer's serial number. Section 922(k) goes farther. It criminalizes the mere *possession* of a firearm after a serial number is removed . . . whether or not the firearm is then placed into commerce." 22-cr-97, ECF No. 48 at p. 6. (emphasis in original). The district court in *Price* also offered this analysis:

> Assume, for example, that a law-abiding citizen purchases a firearm from a sporting goods store.  At the time of the sale, that firearm complies with the commercial regulation that it bear a serial number. The law-abiding citizen takes the firearm home and removes the serial number. He has no ill intent and never takes any otherwise unlawful

action with the firearm.  Contrary to the Government's argument that Section 922(k) does not amount to an infringement on the law-abiding citizen's Second Amendment right, the practical application is that while the law-abiding citizen's possession of the firearm was originally legal, it became illegal only because the serial number was removed. He could be prosecuted federally for his possession of it. That is the definition of an infringement on one's right to possess a firearm.

Now, assume that the law-abiding citizen dies and leaves his gun collection to his law-abiding daughter. The daughter takes the firearms, the one with the removed serial number among them, to her home and displays them in her father's memory.  As it stands, Section 922(k) also makes her possession of the firearm illegal, despite the fact that it was legally purchased by her father and despite the fact that she was not the person who removed the serial number. These scenarios make clear that Section 922(k) is far more than the mere commercial regulation the Government claims it to be. Rather, it is a blatant prohibition on possession.

*Id* at 6-7.  "The conduct prohibited by Section 922(k) falls squarely within the Second Amendment's plain text." *Id.* at 7.

Section 922(k) is not a commercial firearm regulation. Rather, § 922(k), broadly "criminalizes the mere possession of a firearm after a serial number is removed, obliterated, or altered in any way, whether or not the firearm is then placed into commerce." *Id.*  Indeed, § 922(k) is a "blatant prohibition on [firearm] possession." *Id.* at 7.

    **B.**    **Section 922(k)'s regulatory scope is inconsistent with the Nation's firearm history and tradition**.

As discussed previously, the second *Bruen* step is an inquiry into whether the firearm regulation at issue comports with the nations' firearm history and tradition. This "analysis is constrained by the Supreme Court's definition of historical tradition as the time of the founding and ratification of the Second Amendment . . . . According to *Bruen*, '[h]istorical evidence that long predates [the ratification] . . . may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2136). "Any modern regulation that does not comport with the historical understanding of the right is to be deemed unconstitutional, regardless of how desirable or important that regulation may be in our modern society." *Id.* at 8. In fact, "[u]nder *Bruen*, [this court] is limited to considering whether Section 922(k) is consistent with the Nation's historical tradition of firearm regulation." *Id.* In which case, "the crux of the historical inquiry is to determine the understanding of the right at the time it was enshrined in the Constitution." *Id.* "Courts 'are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the Government's] burden.'" *Id.* at 10 (quoting *Bruen*, 142 S. Ct. at 2150.).

At this second step of the *Bruen* analysis, the government will not be able to proffer evidence showing a national firearm history and tradition from the time of the Nation's founding supporting § 922(k)'s serial number regulatory

proscriptions.   As noted in *Price*, firearm serial numbers are of wholly recent vintage:

> The first legal requirement for serial numbers did not appear until 1934 when Congress passed the National Firearms Act. Pub. L. No. 73-474, § 8(a), 48 Stat. 1236, 1239 (1934). That requirement only applied to certain firearms, such as machine guns and short-barreled rifles. The first precursor to Section 922(k) appeared in the Federal Firearms Act of 1938 and made it unlawful "for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered." Pub. L. No. 75-785, § 2(i), 52 Stat. 1250, 1251 (1938). Serial numbers were not broadly required for all firearms manufactured and imported in the United States until the passage of the Gun Control Act of 1968.

*Id.*  Moreover, "[i]t is undisputed that serial numbers were not required, or even in common use, in 1791." *Id.*

Even in 1968, at the time of the Gun Control Act, "there was no prohibition on mere possession of a firearm that had the serial number altered or removed.  In fact, it was not until the *Crime Control Act of 1990* that Section 922 was amended . . ." *Id.* at 11 (emphasis added).  The 1990 amendment inserted the comparable existing language "'to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.'" *Id.* (quoting § 922(k)).

In effect, § 922(k) addresses a *recent*, but non-historical and non-traditional regulatory need and Congressional concern regarding obliterated serial numbers. As stated in *Price*, a "review of the legislative history provides little insight into the problem Congress hoped to address in making [1990 change]," *see id.* at 12, "but earlier versions containing the same proposed change suggest that Congress intended to broaden the Bureau of Alcohol, Tobacco, and Firearm's jurisdiction to attack the black market in firearms by redefining the interstate nexus as it relates to stolen firearms and firearms with obliterated serial numbers." *Id.* (internal citations omitted). As showed conclusively in *Price*, federal serial number firearm regulation is not moored in the nation's firearm history and tradition, and certainly, was not understood at the time of the Second Amendment's 1791 ratification to be a legitimate, accepted, or widespread limitation on the exercise of firearm possession. It is evident that firearm serial number regulation is a modern congressional concern and § 922(k)'s enactment is related to recent congressionally defined regulatory firearm imperatives. As stated in *Price*:

> A firearm without a serial number in 1791 was certainly not considered dangerous or unusual compared to other firearms because serial numbers were not required or even commonly used at that time. While [the court] recognize[s] there is an argument, not made by the Government here, that firearms with an obliterated serial number are likely to be used in violent crime and therefore a prohibition on their possession is desirable, that argument is the exact type of means-end reasoning the Supreme Court has forbidden [courts] from considering. And the founders addressed the societal problem of non-law-abiding

citizens possessing firearms through materially different means—felon disarmament laws like Section 922(g)(1).  Under *Bruen*, this is evidence that [922(k)] . . . [as a modern regulation] is unconstitutional.

*Id.* at 14 (internal citations omitted).

In the instant case, unlike in *Price*, the government does make the argument that firearms with an obliterated serial number are likely to be used in violent crime and thus any prohibitions on their possession are justified and survive Second Amendment challenges.  Defendant Sing-Ledezma, like the district court in *Price*, avers that the government's position necessarily involves the two-step means-end scrutiny and reasoning *Bruen* forbids district courts from considering. *Id.*

But, as in *Price*, the government's attempt here to cast § 922(k) as a reasonable commercial-like regulation is also unavailing.  As stated in *Price*, "18 U.S.C. § 923(i) is the commercial regulation that requires manufacturers to place serial numbers on firearms" and other "[o]ther commercial regulations may well require that any firearm sale only involve firearms bearing a manufacturer's serial number."  *Id.* at 6.  "[C]ommercial regulations that apply only to manufactures and sellers do not implicate an individual's right of possession."  *Id.* at 5.  "Importantly though, the statute at issue here is not a commercial regulation" but a criminal regulation sanctioning possession.  *Id.*

In support of its burden, the government offers and references several purported regulations. These proffered firearm regulations fail as they function as commercial regulations, not regulations restricting and *criminalizing* mere possession of individual firearms for "any way" or any manner of alteration of a serial number. *Price*, 22-CR-97, ECF No. 48 at p. 5. The government's proffer of references in its response to Defendant Sing-Ledezma's motion are essentially, and function as, certificate(s) of proof that certain firearms, muskets, pistols, or rifles, "were good and strong;" but the references the government cites did not involve manufacturer serial numbers, destruction of manufacturer serial numbers, or criminal sanction for effecting some aspect of the production process for every type of firearm. The regulations the government references in its response to Defendant Sing-Ledezma's motion to quash/dismiss dealt with the operation of the firearm and functionality of a firearm, not serialization. It is important to remember that § 922(k), criminalizes the possession of a firearm, based on any change to a manufacturer's serial number, whether it functions or not.

Critically, the government offers no evidence from § 922(k)'s legislative history that any of the regulations it references in its response were the harbinger for the eventual 1990 Crime Control Act serial number regulations, or that early firearm commercial regulations supported the concept of firearm manufacturer serial number requirements. There is no basis from the government's response to

conclude that the cited and proffered regulations in 1791 were a well-established and representative firearm regulatory analogue.

The government argues in its response to Defendant Sing-Ledezma's motion to quash/dismiss count 4 that there is no lawful purpose for which to possess a firearm with an obliterated serial number, arguing, in effect, that only criminals, will possess firearms with obliterated serial numbers; and thus placing them in the category of non-law-abiding citizens and thus outside the scope of the protections of the Second Amendment. However, why a person wants to possess a firearm is not the dispositive or even relevant question post-*Bruen*, instead, the relevant inquiry is when a firearm regulation burdens firearm possession it falls within the Second Amendment. Consequently, § 922(k) falls within the Second Amendment as it too regulates possession through criminal sanction. There is no history and tradition as understood by the public of criminalizing possession of a firearm with an obliterated serial number since the time of the founding, 1791.

In its response, the government devotes significant effort in pointing to Defendant Sing-Ledezma's status as an undocumented alien (UDA), his encounter with the El Paso Police Department, the items/contraband located and found in Defendant Sing-Ledezma's vehicle and on his person, Defendant Sing-Ledezma's statements, and the initial call that initiated the police response. In short, the government's effort is to portray Defendant Sing-Ledezma as a non-law-abiding

citizen and a criminal.  With this effort and response, it is evident the government misconstrues Defendant Sing-Ledezma's challenge.  Sing-Ledezma's challenge is a facial attack on § 922(k).  Therefore, Sing-Ledezma's conduct is immaterial. The question here is whether the text of § 922(k) constrains, or burdens, conduct that generally falls within the ambit of Second Amendment rights.  Undeniably § 922(k) does so by criminalizing possession of a firearm.  *See e.g., Price*, 22-CR-97, ECF No. 48 at p. 5 (holding that the "conduct prohibited by Section 922(k) falls squarely within the Second Amendment's plain text.").  Specifically, as held in *Bruen*, the Second Amendment protects any person's individual possessory firearm right.  Section 922(k) infringes on that right by imposing criminal sanction if the possession of a firearm accompanies certain serial number alterations.  As stated in *Price*, it potentially criminalizes *how* a person may possess their given firearm.  Defendant Sing-Ledezma's position is that § 922(k) is unconstitutional in all its applications because it cannot satisfy the *Bruen* test. The issue here is the continued vitality of the challenged statute, not Defendant Sing-Ledezma's conduct.  Indeed, no conduct is prosecutable or punishable under § 922(k), as the statute violates the Second Amendment.

Finally, it is important to note that Defendant Sing-Ledezma carries no burden here.  The government, applying *Bruen*, carries the burden to establish that § 922(k) satisfies the history and tradition scrutiny test.  *See, e.g.*, *id.* (internal

citations omitted) (reasoning that "[t]he burden falls on the government to affirmatively prove that its firearms regulation is part of the or analogous to a historical tradition that delimits the outer bounds of the right to keep and bear arms.").  As stated in *Price*, "[the Government has not done so here, and [the court has] no choice but to find 18 U.S.C. § 922(k) unconstitutional."  Id. at 14-15.

Now that Defendant Sing-Ledezma has facially challenged § 922(k), this Court should dismiss count 4.

## **CONCLUSION**

In conclusion, for all the reasons set forth in the previous defense submissions, Defendant Sing-Ledezma respectfully requests that his motion to dismiss count 1 and count 4 of the Indictment be granted.

Respectfully submitted,

/s/ Eduardo Solis
Eduardo Solis
901 Wyoming Avenue
El Paso, Texas 79902
915-544-1818
915-544-4068
SBN: 00785012

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing instrument was filed with the U. S. District Clerk's Office for the Western District of Texas utilizing the Case Manager Electronic Case File (CM/ECF) system on this the 18th day of Novmeber 2023, thereby giving notice to all interested parties.

/s/ Eduardo Solis
Eduardo Solis
